UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Kerri Burch, | § | |
| Plaintiff | § | |
| | § | Civil Action: H _____ |
| vs. | § | |
| | § | |
| San Jacinto College District, | § | Jury Trial Demanded |
| Defendant | § | |
| | § | |

## Plaintiff's Original Complaint

San Jacinto College District took away Sergeant Kerri Burch's livelihood based on nothing more than unsubstantiated allegations of using unprofessional language.

When black officers within the College's Police Department faced documented, substantiated allegations of using unprofessional language and other serious misconduct, the College gave the black officers the benefit of the doubt and let the misconduct slide. But when those same officers brought false allegations against Sgt. Burch, who is white, the College took it as gospel truth. When Sgt. Burch brought this double-standard to the College's attention it fired her in retaliation and because of her race. After the termination, the College went to great lengths to continue the retaliation and prevent Burch from continuing her career as a law enforcement officer.

This lawsuit challenges the College's race-based discrimination and retaliation against Kerri Burch. All employers, especially police departments, should make decisions based on the truth, and must not punish employees for reporting illegal discrimination.

**Parties**

1. The plaintiff, Kerri Burch, is an individual who resides in Houston, Harris County, Texas.

2. The defendant San Jacinto College District ("the College") is a locally controlled, public community college in Harris County, Texas. The College can be served through its Chancellor, Dr. Brenda Hellyer, 4624 Fairmont Pkwy, Suite 200, Pasadena, TX 77504.

**Jurisdiction and Venue**

3. This case is brought under Title VII of the Civil Rights Act of 1964 and under 42 U.S.C. § 1981.

4. The Court has jurisdiction of this case according to 28 U.S.C. §§ 1331 and 1343.

5. Venue is invoked pursuant to 28 U.S.C. § 1391.

**Statement of the Plaintiff's Case**

6. Kerri Burch has over 20 years of law enforcement experience. She attended the Pasadena, Texas, police academy in 1983 and, after graduating, began working for the Pasadena Police Department. She served first on patrol and then was chosen as a Juvenile Investigator, which was the position she held until she left the department in June of 1989 after the birth of her daughter. Burch held subsequent law enforcement positions with the Harris County Constable's Office, Precinct 2 (reservist), the Pasadena Independent School District Police Department, and the Harris County Constable's Office, Precinct 1. She, along with many other officers, was laid off from Precinct 1 in March 2011.

7. On July 11, 2011, the San Jacinto College District ("the College") hired Burch to work in its Police Department. At that time, the College had three campuses – North, Central, and South and it employed approximately 20-25 full-time and part-time peace officers.

8. Over the course of the next four years, the College employed Burch as a patrol officer on both evening and day shifts, and assigned her, in turn, to all three campuses. Throughout her employment, Burch conducted herself in a manner that was fair and ethical, and she exhibited a sense of duty and honor for the position entrusted to her.

9. The Texas Commission on Law Enforcement (TCOLE) certified Burch as a Basic, Intermediate, Advanced, and Master Peace Officer. TCOLE also certified Burch as a Field Training Officer and a TCOLE Instructor.

**The College Rates Burch's Performance Highly Through August 2015:**
**"She consistently represents both the college and department in a positive light."**

10. In July 2012, Sgt. David A. Gardner was Burch's supervisor and wrote her first performance evaluation. He made a number of complimentary observations. In the category of ethics and professionalism, for example, he rated her at 3.67 out of 4.00, noting, "Officer Burch is very professional, keeps her commitments, she is always honest and fair to others." Under excellence and quality results, he gave her 3.33 out of 4.00, observing that "Burch will generally take control and do what she needs to do to rectify whatever needs to be done or corrected." Under accountability, Sgt. Gardner gave her 3.67 out of 4.00, noting, "Officer Burch takes ownership for her actions and will do what she needs to do if the action needs corrected. [S]he has no problem admitting her weaknesses or her strengths. Officer Burch has never missed a meeting that she was assigned and has given more than adequate notice when she is absent."

11. The College promoted Burch to Sergeant in January 2013.

12. In August 2013, Sgt. Ronald Johnston evaluated Burch's performance. He too was favorably impressed:

> She has had to handle and deal with several difficult situations during this rating period. Sgt. Burch handled those issues in a positive and professional manner.
>
> Her efforts and dedication to her new duties and responsibilities are greatly appreciated by her Supervisor.

13. Then Lt. Bruce Caldwell issued Burch's next performance evaluation in August 2014. Caldwell observed:

> Sgt. Burch's exposure to the departments and personnel she has worked with at the district office has helped her to have a deeper understanding of the inner workings of the college.   Her work there crossed many department lines and she was viewed as an asset.

He also observed that Burch "remained professional and performed her new assignment in accordance with the college values."

14. One year later, on August 31, 2015, Lt. Pigeon gave Burch the highest possible performance rating: 3.0 out of 3.0. He was highly-complimentary, praising her communication skills, her leadership development, and her ability to think outside the box:

> Kerri creates and maintains appropriate relationships with faculty, staff and students alike. I have observed her interaction with students and she quickly secures their trust and confidence. She consistently represents both the college and department in a positive light.
>
> Kerri holds herself accountable for her actions and those that she leads. She is developing coaching and mentoring skills necessary to be a successful leader and uses those skills when dealing with subordinates.
>
> Kerri thinks outside the box as necessary and appropriate both as a supervisor and in delivery of service to our customers/community.

4

15. Over the course of the next several weeks, neither Lt. Pigeon nor any other member of the department's Command Staff expressed any dissatisfaction with Burch's performance. Her performance was not criticized or even questioned, and she was neither counseled nor disciplined.

**College Changes Course**

16. On September 28, 2015, Lt. Caldwell handed Burch a three-page memorandum setting forth an accusation against her brought by rookie officer Christopher Darden. Caldwell informed Burch he was conducting an investigation into whether she behaved inappropriately by using profane language in front of Darden and by making discourteous or disrespectful comments to him about several department employees while in uniform.

17. Burch informed Caldwell that she had not behaved or said anything inappropriate to Darden as alleged, and Caldwell ordered Burch to provide him with a written statement admitting or denying that she made the statements or used profanity in Darden's presence.

18. Burch responded to the allegations, in writing, denied that she had made the inappropriate comments, and told Caldwell what she actually said to Darden in the car: she told him a cautionary tale about a law enforcement friend of hers who was killed in the line of duty. She also complained about disparate treatment and harassment, noting that there was a double-standard at work in the department by which African American officers who engaged in blatant misconduct were not disciplined whereas she was being set up for discipline on the flimsiest of excuses.

19. On November 10, 2015, Chief of Police William Taylor wrote a letter to Burch telling her she was terminated. According to his letter, she was losing her job because she allegedly

5

"used inappropriate language including profanity, made derogatory and hostile comments regarding other supervisors and officers in the San Jacinto College Police Department" when speaking with Darden, and then "directed the subordinate not to reveal the information."

20.   According to the College, Burch made these alleged comments to Darden on September 4, 2015, while the two were driving to a funeral for Harris County Deputy Darren Goforth, who was killed in the line of duty. Burch and Darden were the only two people in the car at the time of the alleged conversation; no other individual claimed to have personal knowledge of what was and was not said in the car that day.

21. Taylor has since admitted under oath that, with regard to the reason for her termination, Burch violated no department policy or procedure.

### The False Allegations the College Relied on to Fire Burch

22.   Harris County Deputy Darren Goforth was killed in the line of duty on August 28, 2015, and his funeral was held at Second Baptist Church in Houston on September 4, 2015. A number of officers from the College attended the funeral. Darden and Burch were two of them.

23. Darden, a rookie who had been with the department less than six months, worked the night shift on September 3-4. When Burch arrived for work at the South Campus shortly before 7:00 a.m., she looked for the patrol vehicle she had specifically readied for the funeral and, not finding it, called Lt. Gamboa. Lt. Gamboa said that Darden had the vehicle and was then at Central Campus. The lieutenant told Burch she would send Darden to pick her up. Darden did.

24. When Darden came to South Campus, Burch was on the phone with another police officer with College, Officer Patricia Bradley. Officer Bradley and Burch talked about which

officers from the North Campus were attending Deputy Goforth's funeral. Burch learned that Bradley was not going because she was on-duty that day.

25. During the drive to the funeral, Burch and Darden talked about officer safety, among other things. Burch told Darden about her friend, Pasadena Police Officer Jeffrey Ginn. Like Deputy Goforth, Officer Ginn was killed in the line of duty during an ambush. Burch told Darden about this tragic incident because Darden was a rookie and she wanted to stress how important it was for a law enforcement officer to be constantly diligent and alert for danger – not only for the safety of the community, but also for an officer's safety.

26. Other officers from the College who were present at Deputy Goforth's funeral were Officers Aurora Zuniga, Eric Lister, Lakeita Carr, Raul Juarez, and Cher Alvarez, and Lt. Marisol Gamboa.

27. As Burch and the others were leaving the funeral services, Lt. Gamboa told Burch that she, not Darden, should drive the patrol car back to the College because, she explained, she thought Darden was too tired to drive. Burch did as directed and, during the ride, Darden agreed that Lt. Gamboa was right, that he was particularly tired. Hearing that, Burch offered to find someone to substitute for him that night. As she explained to him, it was a question of safety. Darden responded that, if she could find someone to work his shift for him, that would be great.

28.   Burch then found someone to cover for Darden's shift that night and so informed Lt. Gamboa, who approved the substitution.

29. Darden never said anything to Burch that day, or at any later date, indicating that he was in any way uncomfortable with or objected to anything she said to him or in his presence on the day of Goforth's funeral. And, until Lt. Caldwell gave her formal notice of the complaint at

the end of the month, no one else mentioned anything to Burch about Darden being upset about anything she said or did on the day of the funeral.

30. But, as Burch later learned, on September 16, 2015, Darden typed a three-page memorandum to Lt. Gamboa claiming that Burch spent most of the time in the car on the day of the funeral making unflattering comments about other officers who worked in the department. He said that Burch was talking on her cell phone when he picked her up and was making derogatory remarks about Officer Lakeita Carr. Darden alleged further that, after Burch ended that telephone call, she continued making unflattering statements about Carr, Sgt. Kendria Newsome, Officer Iesha Holland, and several other members of the department.

31. Officers Darden, Carr, and Holland, Sgt. Newsome, and Lt. Caldwell are African American; Burch is white.

32. Darden's accusations are false. Burch did not make the negative remarks that he attributes to her.

33. The only third party with personal knowledge of anything Burch said to or in front of Darden that morning is Officer Bradley, with whom Burch was speaking on her cell phone when Darden picked her up. Bradley reported that, during that brief conversation, she and Burch talked about logistics – who was going to the funeral from San Jacinto College, why Officer Bradley was not able to attend the funeral, and who was riding with whom.

34. No one corroborated what Darden claims that Burch said. At best, a few witnesses say that Darden looked "upset" at the funeral, which is to be expected at such a solemn occasion. Two officers say that Darden told them that Burch had made comments that upset him. But, their

testimony about what Darden said at the time is not consistent with what Darden put in his letter of complaint to Lt. Gamboa.

35. Officer Carr, for example, reported in her statement that, when she saw and spoke with Darden at the funeral, Darden complained about how Burch had "instructed him the entire drive to the funeral and critiqued everything he did along the way."

36. Officer Iesha Holland reported that, when she saw and spoke with Darden after the funeral, he complained that Burch had asked him a lot of questions about working on third shift at South Campus. According to Holland's statement, Darden told Holland that Burch questioned him throughout the drive about whether and how often he saw Sgt. Nathaniel Vital and Officer Holland during the course of a shift and whether Lt. Gamboa's husband accompanied her when she went to South Campus.

**Burch's Response to Caldwell and Her Complaints of Disparate Treatment/Harassment**

37. Burch was shocked to learn of the accusations, and asked Caldwell for a copy of Darden's statement, and for statements made by others. Caldwell refused to provide those, saying she was not entitled to see those documents.

38.   Burch prepared her response to the memo written by Lt. Caldwell and turned it in to him as ordered on October 2, 2015. In that response, Burch unequivocally denied making the derogatory comments that Darden attributed to her. She also explained that, while she was unable to admit or deny whether she used any profanity whatsoever in his presence that day, she could and did deny that she used profanity with regard to any officers or personnel of the College. And she informed Caldwell that the topic of her conversation with Darden in the drive to Deputy

Goforth's funeral was the ambush-style killing of Officer Jeffrey Ginn of the Pasadena Police Department, who was a personal friend and fellow Academy classmate.

39. In her letter to Caldwell, Burch also complained of the disparate treatment, harassment, and double-standard at play in this attack on her. First, she described what two Human Resources officials had said to her in an effort to excuse the fact that an African-American officer had used profanity with regard to fellow officers at the College.

40. The incident to which Burch was referring was one that involved Sgt. Kendria Newsome, who was with the College at the time and who is African-American. In the summer of 2014, several officers and other employees reported that, during a going-away party attended by both civilians and officers, Newsome made a number of disparaging, profane comments about Lt. Pigeon and Lt. Gamboa, including referring to Lt. Gamboa as Lt. Pigeon's "little b*tch."

41. During the investigation of the complaint against Newsome, Burch was questioned by two San Jacinto College Human Resources personnel. Much to Burch's surprise, the two suggested that Newsome's use of profanity could be viewed as acceptable because it was merely part of – in their words – her "culture," and, when Burch asked for clarification, they defined Newsome's culture as being her race -- *i.e.* because she is black.

42. Burch was offended by what these two Human Resources officials said and reported the inherent racism in that remark to the then-Chief of Police, William Taylor. But, nothing came about as a result of Burch's complaint about the racially-charged comment these officials made about Newsome and her "culture" and the officials' willingness to excuse that officer's misconduct merely because of her race.

43. Burch was not the only employee interviewed by Human Resources about the complaint made against Sgt. Newsome. According to its records, Human Resources interviewed thirteen employees, including ten who attended the party in question, after which it concluded that Newsome had behaved inappropriately and spoke negatively about an officer and a lieutenant in front of other officers, at least one of her direct reports, and new officers.

44. But, despite the conclusion that Newsome had engaged in the misconduct alleged against her, she was not terminated, suspended, or even disciplined. Instead, the department wrote her a letter, which it identified as a "Final Corrective Action Notice" on September 12, 2014, which advised Newsome that, if she did not, *inter alia*, "model appropriate leadership and professional behavior at all times," "refrain from the use of profanity at work," and maintain confidentiality, she would be "placed on further corrective action, up to and including termination."

45. Burch's letter to Caldwell also described an incident in which there was substantial evidence that Officer Iesha Holland, who is African-American, had engaged in serious misconduct and yet suffered no adverse consequences. Namely, she stole from a convenience store while on duty.   Video from a local convenience store showed Officer Holland - in uniform - taking items off the shelf of the convenience store and then leaving without paying. Despite this evidence of criminal activity, no action was taken against Holland. The matter was not referred to the District Attorney's Public Integrity Section for investigation, neither the department nor the College conducted a formal investigation, and Holland was never disciplined.

46. Burch's memo to Caldwell also pointed out that a number of officers reported that Sgt. Newsome and Officer Carr had made a number of disparaging comments about her in the

past. Those remarks were well-known to Chief Taylor and the College Administration (specifically Kenneth Lynn, the Vice Chancellor). But the College had taken no steps to stop such remarks, much less discipline the perpetrators. Instead, Burch was ordered to "put the matter behind [her] and go on with [her] life."

47. Officer Carr has a long record of misconduct at the College, including perjury, insubordination, and making false accusations against fellow officers. Yet she never suffered termination, or even serious disciplinary action, as a result of any of it.

48. Burch's memo to Caldwell also noted that both Lt. Pigeon and Lt. Ron Johnson had informed her that white supervisors in the department were not allowed to discipline black officers because that could appear to be discriminatory.

49. After noting that she was being intentionally singled out, harassed, and treated differently, Burch ended her response by volunteering to take a polygraph examination if the department would require the same of Darden.

50. When Burch presented this memo to Caldwell on October 2, 2015, he questioned her about the events on the day of Deputy Goforth's funeral. Burch informed him that she could not remember the exact contents of her conversation with Darden, but informed Caldwell that there was no truth to what Darden was saying about her. She told Caldwell that the main topic of the conversation she had with Darden was about the death of her friend and fellow Academy classmate who, like Deputy Goforth, had died in an ambush-type killing. And she identified that fallen officer as Pasadena Police Officer Ginn.

51. Caldwell also tried to get Burch to change her statement. He told her to remove the portion of her response in which she made reference to what Human Resources had said about

another officer, an African-American, who was accused of using profanity. When Burch refused

to change her statement, Caldwell became irate and said that the conversation to which she made

reference was irrelevant. Burch disagreed, and explained that it was relevant to address what

happened when an African-American officer was accused of using profanity as compared to what

was happening to her.

52. Lt. Caldwell also told Burch to remove from her statement the reference to the

evidence that an African-American officer had stolen from a convenience store while on duty and

that the College had turned a blind eye to the evidence and failed to take any action. Burch

refused to take this statement out as well because it too showed that a double standard was at

play – there was one standard applied to African-American officers and another to white officers.

53. And, Lt. Caldwell ordered Burch to remove from her statement all references to

Carr's and Newsome's misconduct, and her complaints about disparate treatment and

harassment. Again, Burch refused – because it was her right to point out the disparate treatment

and to raise the issue of her own legal rights.

**No Investigation of Burch's Complaints; No Follow-up with Burch**

54. The discussion that Burch had with Caldwell on October 2, 2015, was the only time

that anyone from the College ever talked to her about Darden's accusations. And, aside from Lt.

Caldwell telling Burch to remove the information from her response, no one from the department

or the College ever spoke with her about or investigated her complaints of disparate treatment

and harassment. Chief Taylor never asked her any questions, nor did Human Resources.

**Lt. Caldwell's Conclusion and Sgt. Burch's Termination**

55. In a 12-page memo dated October 26, 2015, Caldwell informed Taylor that he conducted a formal investigation into the complaint lodged against Burch by Darden and found that there was sufficient evidence to sustain the complaint against Burch.

56. On November 10, 2015, Chief Taylor wrote and delivered the letter to Burch advising her that he was sustaining the allegations of unprofessional conduct against her and terminating her employment.

57. On November 13, 2015, Burch asked Chancellor Dr. Brenda Hellyer, and Sandra Ramirez, the Vice President of Human Resources, for a secondary review of her termination.

58. On December 17, 2015, Brenda Hellyer, Ed.D., Chancellor, wrote to Burch, upholding Chief Taylor's decision to terminate Burch's employment.

59. Neither Taylor nor Hellyer performed any independent investigation or analysis. They relied on and credited all of Caldwell's findings and conclusions.

**Misconduct by Sgt. Kendria Newsome**

60. Not coincidentally, November 10, 2015, was the same day on which the College fired Sgt. Newsome. By that date, the College had concluded that Newsome had engaged in misconduct, including incidents involving factual allegations substantially similar to those alleged against Burch, on no fewer than five occasions.

61. On September 3, 2015, Chief Taylor issued Newsome a "Final Corrective Action Notice – Addendum." In this document, Taylor states that Newsome's behavior towards another officer "did not model the College's values" and that she "behaved inappropriately and unprofessionally and [] made the officer feel uncomfortable." And, again, Taylor instructed

14

Newsome that, if she did not, *inter alia*, "model appropriate leadership and professional behavior at all times," "be," and "demonstrate immediate and sustained improvement," she would be "placed on further corrective action, up to and including termination."

62. Not until it decided to fire Burch, however, did the College decide to fire Newsome. No doubt, the College sought to cover up the fact that it was terminating Burch for an unlawful reason.

**The Leniency Shown When African-American Officers Engaged in Misconduct**

63. There was a double-standard at work in the department by which African-American officers who engaged in blatant misconduct were either not disciplined at all, or were shown great leniency. These individuals included Sgt. Newsome, and Officers Carr, Holland, and Paul Wilson.

**Post-Employment Retaliation by the College**

64. The College did not stop with just firing Burch. It also made a negative report about her discharge to the Texas Commission on Law Enforcement, categorizing her termination as a "General Discharge" on what is known as an F-5 report. That report is dated November 10, 2015.

65. By definition, a General Discharge signals that the officer's termination was related to a disciplinary investigation of misconduct. As anyone in Texas law enforcement well knows, this categorization can and does serve as a significant barrier to an officer obtaining another job in law enforcement. And, indeed, Burke has been unable to find a comparable job.

### The State Reverses the F-5 Designation
### And Finds College's Story to Lack Credibility

65. Burch filed an administrative appeal of College's characterization of her discharge as a General Discharge on the F-5.

67. An evidentiary hearing before the State Office of Administrative Hearings, which has jurisdiction over the appeals of F-5 reports by law enforcement officers, was finally held on September 16, 2016.

68. After hearing sworn testimony from Darden, Burch, and Caldwell, and after reviewing the written statements Caldwell collected, The Honorable Judge Stoebner granted Burch's appeal and ordered that her F-5 Report be changed to show that she was Honorably Discharged.

69. Judge Stoebner concluded that the disparity between Darden's testimony and the witness statements "suggests that the interaction between Officer Darden and [Sgt.] Burch was different" than Darden had described. Judge Stoebner also found it significant that Caldwell, who was promoted to Chief of Police after Burch was fired, admitted under oath that he did not find Darden to be more believable than Burch.

### Other Post-Termination Retaliation by the College

70. Still, the College did not stop trying to ruin Burch's career as a law enforcement officer. After Burch filed her Charge of Discrimination with the Equal Employment Opportunity Commission, Caldwell undertook steps to try to convince the Harris County District Attorney's Office to include Burch in its Disclosure Database.

16

71. By November of 2016, Chief of Police Bruce Caldwell falsely told the Harris County District Attorney that Burch was fired because she violated Department policies and procedures regarding unprofessional conduct.

72. Caldwell interfered with at least one job prospect Burch had by informing that prospective employing law enforcement agency that Burch was in the Harris County District Attorney's Disclosure Database.

73. While information about which law enforcement officers are or are not in the Harris County Disclosure Database is normally privileged, Caldwell's statement to this other law enforcement agency was also false. But, Caldwell's effort to interfere with her ability to obtain a job at this other law enforcement agency worked, and Burch was not offered employment.

74. Despite her diligence and reasonable efforts, Burch has not succeeded in finding comparable employment since her termination by the San Jacinto College District.

**Exhaustion of Administrative Remedies**

75. Burch timely filed a charge of discrimination with the Equal Employment Opportunity Commission. After over 180 days passed, Burch requested a right-to-sue letter. Burch received a right-to-sue letter from the United States Department of Justice, and timely files this complaint.

17

**CAUSES OF ACTION**

<u>Statutory Violations: Race Discrimination and Retaliation</u>

76. San Jacinto College District fired Burch because of her race and because she complained of discrimination. Its stated reason for firing Burch is false and is a pretext for its unlawful motive(s).

77. The College's conduct violates Title VII of the Civil Rights Act of 1964, which prohibits discrimination in employment on the basis of race, and retaliation against an individual for reporting and objecting to such discrimination and   42 U.S.C. § 1981, which prohibits discrimination because of race in the making and enforcement of contracts, including positions of employment, and retaliation for reporting and protesting against such discrimination.

**DAMAGES**

78. The College's actions caused economic damages to Burch in the form of lost wages and benefits, past and future.

79. The College's actions also caused Burch compensatory damages; she has experienced the type of mental anguish, embarrassment, anger, frustration, disappointment, regret, despair, and disruption of her peace of mind as a result of Defendant's unlawful conduct which any reasonable person would have suffered under like circumstances. She has also suffered compensable out-of-pocket expenses as a direct result of having been unlawfully terminated from the College.

**RELIEF REQUESTED**

The plaintiff asks this court to enter a judgment:

a.      Declaring that the acts and practices complained of in this Complaint are in

        violation of the law;

b.      Enjoining and permanently restraining these violations of the law;

c.      Declaring that the acts and practices complained of in this Complaint are in

        violation of the United States Constitution;

d.      Enjoining and permanently restraining these Constitutional violations;

e.      Directing the defendant to pay plaintiff actual and compensatory damages that she

        suffered, past and future;

f.      Awarding plaintiff pre-judgment interest on the amounts owed at the maximum

        rate allowed by law;

g.      Awarding plaintiff the costs of this action, together with reasonable attorneys' fees

        and expert witness fees;

h.      Awarding plaintiff post-judgment interest on the amount of judgment until paid at

        the maximum rate allowed by law; and

i.      Awarding plaintiff such other relief, legal or equitable, as may be warranted.


                                    Respectfully submitted,


                                    _____
                                    Margaret A. Harris*
                                    Southern Dist. ID 87
                                    State Bar No. 09081400
                                    Paul R. Harris

State Bar No. 24059905
S.D. Tx. No. 897365
1007 Heights Boulevard
Houston, Texas   77008
(713) 526-5677
(888) 370-5038 (fax)

* Attorney in charge for the Plaintiff
Kerri Burch